UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RONNIE E. HAMPTON, JR.,

       Plaintiff,

vs.                                                    Case No.

LINCOLN LIFE ASSURANCE                  HON.
COMPANY OF BOSTON,

       Defendant.

_____

Troy W. Haney (P48614)
HANEY LAW OFFICE, P.C.
Attorney for Plaintiff
330 East Fulton Street
Grand Rapids, MI 49503
Telephone:  616-235-2300
Facsimile:  616-459-0137
Email:  thaney@troyhaneylaw.com

_____

## **COMPLAINT**

      Plaintiff, Ronnie E. Hampton, Jr., by his attorney, Troy W. Haney of Haney

Law Office, P.C., and for his complaint against Defendant, Lincoln Life Assurance

Company of Boston, states as follows:

### **Nature of Action and Jurisdiction**

1.    This is a civil complaint brought by Plaintiff, Ronnie Hampton ("Plaintiff"),

      under the Employee Retirement Income Security Act ("ERISA"), §502, 29

U.S.C. 1132, regarding breach of the terms of an employee benefit plan and breach of fiduciary duties, for the purpose of compelling Defendant to provide certain disability insurance benefits in amounts and at the coverage levels promised and for an accounting, recovery of damages, costs, and attorney fees incurred as a consequence of Defendant's breaches of its obligations and duties under ERISA as detailed herein.

2.    This Court has subject jurisdiction over Plaintiff's claims pursuant to ERISA §502(e) and (f), 29 U.S.C. 1132(e) and (f) and 28 U.S.C. 1331.

3.    Venue properly lies in this District pursuant to ERISA §502(e)(2), 29 U.S.C. 1132(e)(2).

### Parties and General Allegations

4.    At all relevant times, Plaintiff was a participant, as defined by ERISA §3(7), 29 U.S.C. 1002(7), in the "Comcast Corporation Comprehensive Health and Welfare Benefit Plan" ("the Plan") provided by Comcast Corporation ("Comcast"), to its eligible employees, including Plaintiff, administered and funded by an insurance policy issued by Liberty Life Assurance Company of Boston ("Liberty") to Comcast, for group disability benefits as group policy no. GF3-830-502315-01.

5.    At all relevant times, the Plan was an employee welfare benefit plan within the meaning of ERISA §3(1), 29 U.S.C. 1002(1), sponsored by Comcast and

funded by the above-referenced insurance policy issued by Liberty. However, in the time since the policy was first issued, Liberty has since been acquired by the Lincoln Financial Group, and now does business as the Lincoln Life Assurance Company of Boston ("Lincoln"). As such, Lincoln is the proper party to defend this matter and the sole entity responsible for the payment of claimed benefits set forth below.

6.    At all relevant times, Defendant was the fiduciary of the Plan within the meaning of ERISA §3(21), 29 U.S.C. 1002(21), in that Defendant acted as a claims administrator and as a fiduciary for the Plan and exercised authority and control over the payment of long term disability "LTD" benefits, which are assets of the Plan. Pursuant to 29 C.F.R. §2560.503-1(h)(1), Defendant, therefore, functioned as an administrator for claims procedure purposes.

## Facts

7.    At all relevant times the Plaintiff was employed full-time by Comcast as an Account Executive.

8.    On February 3, 2011, due to severe and chronic back pain, the Plaintiff underwent a lumbar laminectomy and fusion at L3, L4, and L5. Unfortunately, the fusion at L4-L5 was unsuccessful.

9.    The Plaintiff's diagnosed medical conditions are as follows:

- Lumbar Degenerative Disc Disease, at L2-L3-L4-L5-S1;
- Lumbar radiculopathy, with nerve root impingement;

3

- Lumbar laminectomy and fusion of L3-L4-L5, with failed fusion at L4-L5.
- Chronic low back pain;
- Herniated disc;
- Lumbar facet arthropathy;
- Hypertension;
- Morbid obesity;
- Glucose intolerance;
- Gastroesophageal Reflux Disease ("GERD");
- Asthma; and
- Depression.

10.    Due to the above-described medical conditions and the associated symptomatology, the Plaintiff suffers from severe and chronic back pain, as well as fatigue from the use of narcotics. The Plaintiff has also attempted physical therapy, aqua therapy, various medications, facet injections, and epidural injections without significant pain relief. The Plaintiff is restricted to only occasionally lifting, pushing, and/or pulling less than ten (10) pounds; he can only stand, walk, and/or sit for up to two (2) hours/day, and he walks with a cane; he can only reach with his arms for up to thirty (30) minutes in an 8-hour day; and he can never stoop, bend, crouch, squat, crawl, or climb ladders. The Plaintiff also requires assistance with bathing, grooming, dressing, shopping, meal preparation, laundry, and cleaning.

11.    As a result of the Plaintiff's various medical conditions and the associated restrictions and limitations, the Plaintiff's last day of work was on October 12, 2012.

12.    In the months following the Plaintiff's last day of work the Plaintiff's attending physicians, Dr. Daniel Passerman, Dr. Ryan Barrett, and Dr. Norman Rotter all provided multiple notes that the Plaintiff should continue to remain off work.

13.    It should also be noted that in 1998, the Plaintiff suffered a gunshot wound, and continues to have metal buckshot pellets that are lodged in his left-side abdomen. As a consequence, the Plaintiff is unable to utilize Magnetic Resonance Imaging ("MRI") as a diagnostic tool for his various medical conditions.

14.    In accordance with his employment contract the Plaintiff applied for long term disability benefits, which were eventually approved with an effective start date of April 22, 2013.

15.    According to the Plan, because the Plaintiff was a full-time employee "working a minimum of 30 regularly scheduled hours per week", he qualifies as a "Class 4 Employee".

16.    The definition of "Disability" or Disabled" within the Plan is as follows:

   1. For persons other than pilots, co-pilots, and crewmembers of an aircraft:

5

a)  if the Covered Person is eligible for the Maximum Any Occupation benefit, "Disability" or "Disabled" means during the Elimination Period and until the Covered Person reaches the end of the Maximum Benefit Period, as a result of an Injury or Sickness, he is unable to perform the Material and Substantial Duties of Any Occupation.

b)  i) if the Covered Person is eligible for the 12 Month Own Occupation benefit, "Disability" or "Disabled" means that during the Elimination Period and the next 12 months of Disability the Covered Person, as a result of the Injury or Sickness, is unable to perform the Material and Substantial Duties of his Own Occupation; and

ii) thereafter, the Covered Person is unable to perform, with reasonable continuity, the Material and Substantial Duties of Any Occupation.

17.    The definition of "Any Occupation" within the Plan is as follows:

"Any Occupation", with respect to Class 4, means any gainful occupation that the Covered Person is or becomes reasonably fitted by training, education, experience, age, physical and mental capacity. Gainful occupation means any occupation in which the earnings are:

-   Equal to or greater than 80% of the Employee's pre-disability income;

-   Less than 80% of the Employee's average pre-disability income, but higher than the average earnings for the geographic area in which the Employee resides; or

-   Equal to or greater than the gross benefit.

18.    On August 7, 8, 9, 24, and September 7, 2013, the Defendant had covert surveillance conducted on the Plaintiff. Over the entire surveillance period of five separate days, the Plaintiff was only observed on one occasion when he retrieved his mail.

19.    On October 29, 2013, Dr. Daniel Passerman issued a "To Whom It May Concern" letter, which stated,

I am the primary care physician for Mr. Hampton. **He is totally disabled and absolutely cannot work due to his disability**, which

6

is from L3-L4, L4-L5 severe disc disease with foraminal narrowing and lumbar radiculopathy. **He is always in severe pain.** He changes position, sitting, laying, vs. standing, every 15-20 minutes. He has to do this due to his continual pain. **In addition, he is taking opiates and muscle relaxers to help control his pain, which causes him fatigue. Due to these reasons, he is unable to work and in the foreseeable future, will continue to be disabled from work.** He cannot work in a laying position, and even alternating from sitting to standing with the necessary stretching that he does. **There are still not any reasonable accommodations that can be made that would allow him to work.** (Emphasis added).

20. On October 31, 2013, the Defendant referred the Plaintiff's file to Dr. Henry DeLeeuw for a peer record review. Dr. DeLeeuw's report was supportive of the continued restrictions on the Plaintiff's ability to continue working full-time, and stated in part the following,

> Without additional surgical intervention, patient will remain quite limited in physical activities. Appropriate restrictions would include no lifting, pushing, pulling > 10#, no bending below waist level, no stooping, no squatting, no crawling, no sitting, walking, or standing greater than one hour intervals, no more than three hours per shift; no restrictions to fingering, keying, or grasping. Limit work to four-hour shifts. * * *

> Due to increased pain, numbness and instability, poor activity tolerance and endurance, would limit work hours to four-hour shifts. Restrictions and limited hours would remain in place until he proceeds with additional surgical intervention.

21. Although additional surgical intervention has been recommended to the Plaintiff, after obtaining additional medical opinions, the Plaintiff has rejected the idea of further surgery due to the associated risks and potential for becoming paralyzed.

22.  On November 21, 22, 23, and December 4, 12, 16, 2013, the Defendant had additional covert surveillance conducted on the Plaintiff's residence. On November 21, 2013, the Plaintiff was observed slowly walking towards a vehicle with a cane and entering the vehicle as a passenger. However, all other additional activity that was observed at the Plaintiff's residence was of an individual who resembled the Plaintiff, but who was in fact the Plaintiff's brother. This individual was observed walking without assistance, carrying a gym bag, driving a vehicle, and assisting a small child in and out of a vehicle.

23.  On January 21, 2014, the Defendant requested Dr. DeLeeuw to complete an addendum to his October 31, 2013 peer record review in consideration of the recently acquired surveillance, wherein Defendant believed it had video-evidence of the Plaintiff being active without any apparent restrictions. Based on the surveillance video (which was of the Plaintiff's brother), Dr. DeLeeuw revised his recommended restrictions to a point that would allow the Plaintiff to continue working in a full-time position.

24.  On February 6, 2014, the Defendant had a Transferrable Skills Analysis ("TSA") completed by Amanda Voce, MA, CRC. Ms. Voce was requested by the Defendant to base her analysis solely on the restrictions provided in Dr. DeLeeuw's January 21, 2014 report. Ms. Voce's report concluded that there were multiple positions that the Plaintiff could perform, and also claimed that

these positions met the Plan's required wage requirements. However, it should be noted the Ms. Voce does not detail what wage requirement was used for the Plaintiff, and she also utilizes wage comparisons between the 75th and 90th percentile for multiple occupations that the Plaintiff has never previously performed.

25.     On March 28, 2014, the Social Security Administration ("SSA") issued a favorable decision and granted the Plaintiff's claim for Social Security Disability Insurance ("SSDI") benefits, with an effective date of December 1, 2013.

26.     On April 14, 2014, the Defendant issued a letter to the Plaintiff, notifying him that his LTD benefits were being terminated based on its conclusion that the Plaintiff did not qualify as disabled into the "Any Occupation" period, or past April 21, 2014. The Defendant's decision was based in part on the recent surveillance report (which was mostly of the Plaintiff's brother), Dr. DeLeeuw's addendum report, as well as Ms. Voce's TSA.

27.     On April 22, 2014, without the assistance of counsel, the Plaintiff appealed the termination of his LTD benefits under the definition of disability for the Any Occupation period. Upon information and belief, the Plaintiff included with his appeal a "To Whom It May Concern" letter from one of his attending physicians, Dr. Wajeehullah Muhammad, who stated in part,

9

Ronnie Hampton was seen today in clinic.

It is my medical opinion that Ronnie Hampton should remain out of work until 10/15/2014.

He has been suffering from low back pain since 2010. He suffered from degenerative changes in his back and had a fusion of L3-L5 in 2010. This provided some relief, but then his pain has worsened with nerve impingement. He has had multiple injections from the pain clinic, physical therapy, and is taking opiates to try to manage his pain.

Despite these measures, his pain continues. He has to frequently change position from a standing or sitting to laying as he starts to get muscle spasms. Due to this, he has not been able to work as there are not reasonable accommodations that his workplace can make for him. This pain has persisted for several years and failed both conservative and aggressive medical therapy.

Therefore, Mr. Hampton will likely need to continue to be on disability.

28.　On May 6, 2014, the Plaintiff had a telephone conversation with one of

Defendant's representatives, Kathryn Leombruno, who documented notes

from the conversation, and which have been provided from the Defendant's

Claim File:

> [Claimant] stated that the picture of the male with a cane is indeed him however every other picture they have is of his brother, not him – [claimant] stated that his brother called the police because he thought someone was following him and that he has a [concealed pistol] license and was going to shoot the investigator as he thought he was going to get carjacked – [claimant] also indicated there was a conference at the school [because] of the video recording done at the school which turned out to be our investigator – [claimant] indicated that they thought of taking their daughter out of school because of a possible predator – [claimant] indicated that there is over 100 lb. difference between he and his brother – going to forward information to his [attorney] – [claimant] stated that his doctor says he is injured because of his back – advised I would review his file and contact him tomorrow to determine what next steps should be [sic].

10

29. Only three days later, on May 9, 2014, the Defendant reversed its decision to terminate the Plaintiff's LTD benefits during the Any Occupation period, and notified the Plaintiff by letter, stating in part,

> After 12 months, disability will be evaluated based upon the employee's inability to perform the material and substantial duties of his own or any occupation for which he has or becomes reasonably fitted by training, education or experience. Based on the change in definition and the medical and vocational information in our file, you qualify for continuation of benefits.

It should also be noted that the letter did not provide an explanation for the reversal of the decision, nor an apology for the error of the Defendant's decision to terminate the Plaintiff's LTD benefits based on the erroneous surveillance of the Plaintiff's brother.

30. On June 19, 2014, the Defendant notified the Plaintiff that it was transferring his claim over to a different office for "routine management", and that Plaintiff would only be required to submit updated information approximately every twelve months.

31. Over the next six (6) years, the Plaintiff continued to be approved for LTD benefits from Defendant under the Any Occupation definition of disability. During that time, the Plaintiff continued to submit additional updated records, including in part the following:

> **December 8, 2015 – State of Michigan, Medical Needs Form**
> Chronic ongoing illness? **Yes.**

11

Do you certify patient has a medical need for assistance with any of the personal care activities listed below? **Yes. Bathing, grooming, dressing, meal preparation, shopping, laundry, and housework.**

Can patient work at any job? **No.** How long? **Lifelong.**

### August 4, 2017 – Annual Physician's Statement

Please describe any/all Restrictions and Limitations you have imposed: **Cannot sit or stand for more than 15 minutes without changing position. No lifting, bending, or stooping.**

### November 2, 2018 – CT Scan

IMPRESSION: … Degenerative changes at L3-4, L4-5, and L5-S1 levels as described, **resulting in severe stenosis of the right L4-5 neural foramen. Moderate stenosis of bilateral L5-S1 neural foramina. Mild stenosis of the left L3-4 neural foramen.**

### July 15, 2019 – Annual Physician's Statement

Please describe any/all Restrictions and Limitations you have imposed: **Cannot sit or stand for a long period of time. Lower back pain.**

Please describe your treatment plan including medications & diagnostic testing: **Patient had surgery several years ago. He is currently taking hydrocodone, Flexeril, and ibuprofen.**

32.   On April 23, 2020, notes from the Defendant's Claim File show a representative, Kerry Sawyer, noted that voice messages had been left with the Plaintiff inquiring about interest in settlement of his claim, but that due to his failure to respond to the calls, the settlement offer would be processed as a "decline". Although this is a circumstantial detail, it is highly suggestive that the Defendant understood that the Plaintiff's medical conditions, as well as the associated restrictions and limitations, are permanent.

33.    On August 26, 2020, the Defendant notified the Plaintiff that it was suspending his LTD benefits, effective August 25, 2020, based on the Plaintiff's failure to provide previously requested information.

34.    On September 11, 2020, the Plaintiff sent an e-mail to one of Defendant's representatives, Lori Coleman, and stated,

> This is regards to my long term disability. A letter was mailed on June 25th of 2020 and I didn't receive it until late August early September. The letter states my benefits will be suspended until my paperwork is turned in. Due to the slow mail and in Michigan we are having trouble with mail. Can my suspension be waived until I have time to get the paperwork back to you. I've tried to fax over my paperwork several times and the lines are busy. I've tried 603 334 0401 and 603 422 7909 is there another fax I can use?

Shortly thereafter, on the same day, Plaintiff was able to successfully fax an Activities Questionnaire; an Authorization Form; a Claimant Information Form; and a Claimant Supplementary Statement. Also, although the Defendant had requested medical records from Dr. John Traylor, the Plaintiff had not been treating with Dr. Traylor, and therefore he did not submit any medical records from this physician.

35.    On September 14, 2020, another of the Defendant's representatives, Kathleen Johnson, emailed the Plaintiff to inform him that benefits would continue to be suspended, based in part on the still-pending medical records from Dr. Traylor. The Plaintiff responded by email, and informed Ms. Johnson that he

does not treat with Dr. Traylor, and that his prior visit with Dr. Traylor was only for the purpose of a second opinion.

36.    On October 9, 2020, the Defendant issued a letter to the Plaintiff notifying him that it was terminating his LTD benefits based on the following decision:

> We have completed a thorough review of your eligibility for benefits and have determined that benefits are not payable beyond October 6, 2020. * * *
>
> Based on the medical review, you have demonstrated functional impairment which results in restrictions and limitations. These restrictions and limitations include no climbing, squatting, stooping, or working at unprotecting heights, occasional standing, walking, bending, twisting, and lifting/carrying up to 10 pounds, and frequent sitting with the ability to alter positions as needed between sitting, standing, and walking. * * *
>
> There are six occupations identified in your local economy that fell within your transferrable skills and physical capacities. The occupations of Customer Service Representative, Maintenance Service Dispatcher, Work Order Sorting Clerk, Service Clerk, Surveillance-System Monitor and Collection Clerk were found in your area and were found to be gainful wages. Gainful is defined as your pre-disability earnings of $ 4645.32 times the benefit percentage of 60%.
>
> As there are six gainful occupations available to you within your medically supported restrictions and limitations, you are no longer disabled from any occupation. As you are aware, Long Term Disability benefits are payable when you are unable to perform all material and substantial duties of your own or any other occupation. As there is another occupation available that is within your restrictions and limitations, you no longer meet this definition of disability. Therefore, Long Term Disability benefits are not payable beyond October 5, 2020 and your claim has been closed.

37.    The Defendant's decision to terminate the Plaintiff's LTD benefits was based in part on a paper-file review completed by Dr. Sharon Kanelos. In Dr. Kanelos' report, she concluded that the Plaintiff had multiple restrictions and

14

limitations, but ultimately concluded that the Plaintiff was not precluded from performing full-time work. However, it should be noted that Dr. Kanelos did not examine or speak with the Plaintiff, nor did she speak with any of the Plaintiff's attending physicians. It should also be noted that Dr. Kanelos' report was flawed in that her conclusions were based in part on the erroneous surveillance of the Plaintiff's brother, and also based in part on the addendum report from Dr. DeLeeuw that was also based on the surveillance observations of the Plaintiff's brother.

38.     The Defendant's decision to terminate the Plaintiff's LTD benefit was also based in part on a TSA completed by Michelle Reddinger, a Certified Rehabilitation Counselor. Although Ms. Reddinger's report stated that there were multiple positions available that the Plaintiff could perform, it should be noted that her report was based solely on the restrictions and limitations provided by Dr. Kanelos' report, which is known to be based in part on the erroneous surveillance of the Plaintiff's brother. Furthermore, the positions listed in the TSA utilized a wage requirement threshold of only 60% of the Plaintiff's pre-disability earnings, whereas the Plan requires an 80% threshold for Class 4 employees under the "Any Occupation" definition.

39.     It should also be noted that neither of the reports from Dr. Kanelos or Ms. Reddinger were provided to the Plaintiff for an opportunity to review and

respond to the reports before the Defendant made its decision to terminate the Plaintiff's LTD benefits. Because the Defendant's decision to terminate the Plaintiff's LTD benefits was based on the reports from Dr. Kanelos and Ms. Reddinger, both of these reports should have been shared with the Plaintiff, as is required by the Claims Procedures for the Department of Labor, 29 C.F.R. § 2560.503-1(h)(4)(i), in order to be considered a full and fair review.

40.   On December 21, 2020, without the assistance of counsel, the Plaintiff appealed the Defendant's decision to terminate his LTD benefits, and stated in full:

> I am requesting an appeal to the cancellation of my long term benefits. I worked for Comcast for fifteen years and I had to retire because of a bad back. I know some people would love to sit back and collect free money but I was a hard worker earning a good wage to take care for my four kids and wife. When I was informed I had to retire because of medical reasons I was very disappointed. Because I knew the money I was gonna receive wasn't gonna be enough to take care of my family. I got a second opinion from another doctor and I was informed if I had another surgery on my back it could paralyze me. I opted not to do another surgery at that point. I take meds every day to deal with the pain. I'm normally sleeping 16-18 hours a day because of all the pain meds I'm taking. When I'm not sleeping I'm in pain and very uncomfortable. I would like for you to consider starting my benefits back up. I've been behind on bills and my [sic] lose my house do [sic] to my benefits be cut off since August. I've sent over a letter from my doctor stating there is no job I can do on a daily basis because of my disability. I was making 50-70K per year working now with my benefits I'm barely receiving 25K per year.

41.   As part of the Plaintiff's December 21, 2020 appeal, he also provided a "To Whom It May Concern" letter from Dr. Passerman, signed on December 14, 2020, and which stated,

I have been the primary care physician for Mr. Hampton for many years. As you know, he has suffered from debilitating back pain for many years as well. He has had surgery for his illness in 2012. Mr. Hampton has shared with me that he was discontinued on his disability claim. The letter states that there are six potential vocational assignments that he can perform with the restrictions of no climbing, squatting, stooping, or working at unprotected heights. He also has limitations of occasional standing, walking, bending, twisting, and lifting/carrying up to 10 pounds. He requires frequent sitting with the ability to alter positions as needed between sitting, standing, and walking.

The above is factual however it isn't complete. **His illness causes unpredictable pain and he has unpredictable episodes of total incapacity from his pain. This would preclude him from the ability of gaining meaningful employment.** In February, 2020, there was a CT scan of his Lumbar Spine that has demonstrated worsening illness. I urge you to reconsider his disability case. **It is my medical opinion that Mr. Hampton is permanently disabled from any employment.** (Emphasis added).

42.    On March 30, 2021, the Defendant had another paper-file review completed by Dr. Matthew Kalter. It should be noted that Dr. Kalter did not speak with or examine the Plaintiff at any time, nor did he speak with any of the Plaintiff's attending physicians. Upon completion of his review, Dr. Kalter concluded that he could not support any restrictions or limitations for the Plaintiff beyond October 6, 2020, and that the Plaintiff could engage in full-time work. It should also be noted that Dr. Kalter's report was in part based on the flawed reports of Dr. DeLeeuw, Dr. Kanelos, and Ms. Reddinger, who all relied on the erroneous surveillance of the Plaintiff's brother.

43.    According to the Defendant's Claim File, on March 31, 2021, the Defendant sent Dr. Kalter's report to the Plaintiff by mail for an opportunity to review

17

and respond to the report, and provided him with twenty-one (21) days to respond. However, the Plaintiff has reviewed his records and does not have this report on file, nor does he recall ever receiving the report, and therefore, he did not have an opportunity to review and respond to the report.

44.    On May 11, 2021, the Defendant advised that it was maintaining the decision to terminate the Plaintiff's LTD benefits. The decision stated in part,

> We conducted a thorough and independent review of your entire claim. In summary, we acknowledge that he may have continued to experience some symptoms associated with your condition beyond October 6, 2020. However, the information does not contain exam findings, diagnostic test results or other forms of medical documentation supporting your symptoms and impairments remained of such severity, frequency and duration that they resulted in restrictions or limitations rendering you unable to perform the duties of the occupations identified as being with in your functional capacity and vocational skills after that date.
>
> Having carefully considered all the information submitted in support of your claim, our position remains that proof of your continued disability in accordance with the Policy provisions after October 6, 2020 has not been provided. Therefore, no further benefits are payable.

45.    In the May 11, 2021 final denial letter, the Defendant also informed the Plaintiff that his "*administrative right to review has been exhausted; no further review will be conducted by Lincoln Financial Group and your claim will remain closed*" and that the Plaintiff has "*the right to bring a civil action under section 502(a) of ERISA*".

46.    As a result of the aforementioned wrongful actions, the Plaintiff's group waiver of life premium may have also been wrongfully denied by operation of the decision to terminate his long term disability benefits.

## COUNT I
### Claim for Benefits Pursuant to ERISA §502(a)(1)(B),
### 29 U.S.C. 1132(a)(1)(B) against Defendant

47.    The Plaintiff incorporates paragraphs 1 through 46 above as if fully restated herein.

48.    ERISA §502(a)(1)(B), 29 U.S.C. 1132(a)(1)(B) permits a plan participant to bring a civil action to recover benefits due to him under the terms of a plan, to enforce his rights under the terms of a plan and/or to clarify his rights to future benefits under the terms of a plan.

49.    The failure to pay full disability benefits as described above are in direct violation of the terms of the Plan.

50.    The Plan has failed to pay disability benefits to the Plaintiff despite the recommendations of his physicians and disabling medical conditions.

51.    The failure and refusal of the Plan to pay the benefits owed the Plaintiff under the Plan is a breach of the terms and provisions of the Plan.

52.    In addition, the Plan has failed to properly and thoroughly investigate the Plaintiff's claim in the manner required by ERISA's fiduciary and claims procedure requirements.

53.     The actions of the Plan have caused damage to the Plaintiff in the form of the denial of long term disability benefits.

54.     In addition, because the Plan denied the payment of the Plaintiff's long term disability benefits, the Plaintiff became ineligible for other benefits provided through his employment such as pension, medical benefits, and the waiver of group life insurance premiums.

## **PRAYER FOR RELIEF**

Plaintiff requests that this Honorable Court grant the following relief:

A.     A declaratory judgment pursuant to ERISA §502(a)(1)(B), 29 U.S.C. 1132 (a)(1)(B) and 28 U.S.C. 2201, declaring that the Plaintiff is entitled to the group employee benefits in the proper amounts as set forth in the Plan in effect at the time benefits became payable and that the Defendant has violated the Plan and its fiduciary duties by failing to pay these benefits and honor the group waiver of life premium.

B.     A full and accurate accounting by the Defendant of all computations for the Plaintiff's employee benefits, in sufficient detail so that the Plaintiff may ascertain that his benefits are being paid in the proper amount.

C.     An Order compelling the Defendant to pay the Plaintiff forthwith the full amount of employee benefits due to him and to continue such payments for the period set forth in the Plan, including interest on all unpaid benefits.

D.     An Order awarding reasonable attorney fees and costs pursuant to ERISA §502(g)(1), 29 U.S.C. 1132 (g)(1).

E.     Such other relief as may be just and appropriate.

Dated:  August 18, 2021                         /s/ Troy W. Haney
                                                Troy W. Haney (P48614)
                                                HANEY LAW OFFICE, P.C.
                                                Attorney for Plaintiff
                                                330 East Fulton Street
                                                Grand Rapids, MI 49503